**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Michael L Quiel,<br><br>    Defendant. | No. CV-21-00094-PHX-GMS<br><br>**ORDER** |

Pending before the Court are the parties' respective Partial Motions for Summary Judgment (Docs. 37, 39). For the reasons below, both motions are denied.

## BACKGROUND

Defendant Michael Quiel owned and operated two securities brokerage firms from 1987 until 2001. After that, he worked as an investment banker, venture capitalist, and, eventually, as a hedge fund manager with his business partner Stephen Kerr. Together, Quiel and Kerr helped private companies raise capital and go public in exchange for consulting fees and shares of stock.

At some point in the early 2000s, Quiel began using a Visa card that was linked to a bank account in Belize. He did not report this account to the Internal Revenue Service ("IRS"). In 2005, the IRS became aware of the account and subjected Quiel to an audit, which he settled in 2006 with the help of his then-attorney Christopher Rusch. Around the same time, Quiel opened a second bank account in Belize. On May 31, 2006, Rusch alerted

Quiel of deadlines to report the new account to the IRS.  Quiel disclosed his interest in the Belize account for the next three years.  He did not disclose any additional foreign accounts to the IRS during that time.

In 2006 or 2007, Quiel introduced Kerr and Rusch.  On August 2, 2006, Rusch emailed them information about "offshore asset protection programs." (Doc. 40-5 at 2); (Doc. 38-15 at 35, 20:22.)  The message included the following warning: "[o]ffshore asset protection entities and bank accounts require the filing of various tax and informational returns with the US IRS and US Treasury.  A CPA or tax attorney familiar with offshore planning should be used to prepare these returns." (Doc. 40-5 at 3.)  Quiel does not dispute that he received this email but stated "there is no record that [he] read and/or responded to" the message.  (Doc. 47 at 6.)  On September 18, 2006, Rusch asked Quiel and Kerr to sign agreements to form two "Swiss investment funds." (Doc. 40-5 at 5.)  The next day, Quiel returned the agreements (signed in his wife's name) and sent Rusch a wire that he claims was "to fulfill a retainer agreement for Rusch's representation to keep us tax-compliant." (*Id*. (internal punctuation omitted)); (*see also* Doc. 47 at 7.)

Rusch traveled to Switzerland, and, on October 4, 2006, he emailed Quiel and Kerr that once a corporate "structure was in place and agreed upon," the three of them could make a second trip to "open accounts and meet the representatives." (Doc. 40-5 at 14.)  Rusch's message noted that he would send Quiel and Kerr "bank documents" to start the formation process "on Friday." (*Id*.)  On October 12, 2006, Rusch emailed Quiel and Kerr again and confirmed that he was forming two Swiss corporations: one that would operate as a venture capital fund and another to hold "your personal assets that will grow tax free in Switzerland, out of the reach of creditors, and separated by a wall of privacy from your corporate assets." (Doc. 40-5 at 16.)  This email noted that the proposed structure was "very clean" and mentioned that, although Rusch's proposed structure "assume[d] (per our conversations) that you do not want to disclose the Swiss Corp," if Quiel wanted to "be a director or manager" of the venture fund he "could report the FBAR with little other reporting requirements." (*Id*.)

On October 23, 2006, Rusch emailed Quiel and Kerr again and told them he would open their personal accounts and needed them to wire $500,000. (Doc. 40-5 at 98.) Quiel claims he never wired this money. (Doc. 47-2 at 9.) The next day, Rusch told Quiel and Kerr to send their birth dates and passports, which Quiel sent on October 30, 2006. (Doc. 40-5 at 22.) In late 2006, Quiel began transferring Rusch stock. (Doc. 40-1 at 29, 22:24.) Plaintiff claims the stock was transferred for Rusch to deposit into the accounts he set up for Quiel and Kerr. Quiel claims that he believed the stock was being transferred into Rusch's own Swiss bank accounts and, in exchange, Quiel would receive introductions to European bankers.

Whatever the purpose of the transfers, the parties agree that, at Rusch's direction, an individual named Arno Arndt created two Swiss corporations on Quiel and Kerr's behalf: Legacy Asset Management AG ("Legacy") and Swiss International Trust Company AG ("Swiss International"). The parties also agree that an individual named Pierre Gabris opened four accounts at UBS AG ("UBS") and Pictet & Cie SA ("Pictet"), which according to bank statements, contained the following year-end balances as of January 1, 2007, and January 1, 2008:

| Account | Accountholder | 2007 Balance (Stock Value) | 2008 Balance (Stock Value) |
|---|---|---|---|
| UBS #-1090 | Legacy | $ 850,263.00 | $ 612,300.00 |
| UBS #-9732 | Legacy | $ 87,970.00 | $ 0.00 |
| UBS #-2363 | Swiss International | $ 1,314,971.00 | $237,879.00 |
| Pictet #-2625 | Legacy | $ 501,691.00 | $ 983,518.00 |

Gabris apparently listed Quiel and Kerr as the accounts' beneficial owners by using the passports and birth dates they sent to Rusch. In December 2006, Quiel and Kerr met with representatives from Pictet and UBS. Quiel testified that it was fair to say he was "on notice that one of the objectives of the meeting with the UBS representatives would be to

. . . open an account." (Doc. 40-1 at 31, 22:25, at 32, 1:4.) He also admits that he signed a form at Pictet that gave the bank permission to send him information about the account. Account statements from the banks identify Quiel as a beneficial owner of three accounts: UBS #-1090, UBS #-2363, and Pictet #-2625. Quiel also testified that he would periodically tell Rusch what to do with the stock in the accounts. (Doc. 40-1 at 33, 22:25, at 34, 1:3.) Nevertheless, Quiel alleges that "he did not know he had an interest in any other foreign account(s) aside from his Belize account." (Doc. 47 at 17.)

According to Quiel, the accounts were designed to raise venture funds from foreign investors, which would then be invested in companies in the United States. According to Plaintiff, Rusch created the accounts using nominees to obscure Quiel and Kerr's ownership interests so the men could avoid tax liability. Although Quiel maintains that Rusch repeatedly assured him the accounts complied with applicable tax laws, he did not report them to the IRS in 2007 or 2008.

In 2011, a federal grand jury indicted Quiel and Kerr on charges of conspiracy to defraud the United States, willful subscription to false individual tax returns, and willful failure to file Reports of Foreign Bank and Financial Accounts ("FBARs"). On April 11, 2013, Quiel and Kerr were acquitted of the conspiracy charges, but both were convicted of willful subscription to false individual tax returns. Kerr was criminally charged for willfully failing to file FBARs, but the jury did not return a verdict for Quiel on those charges. However, on January 29, 2019, the IRS assessed civil penalties against Quiel for willfully failing to report the four UBS and Pictet accounts on his 2007 and 2008 FBARs. The pending partial motions for summary judgment arise from this assessment.

**DISCUSSION**

**I.      Partial Motions for Summary Judgment**

This case is an action to reduce a penalty to a judgment. Such an action is authorized under 31 U.S.C. § 5321(a)(5), which states that the Secretary of Treasury may "impose a civil money penalty on any person who violates, or causes any violation of section 5314."[1]

---

[1] Under 31 U.S.C. § 3711(g)(4)(C), the Secretary may refer such a claim to the Department

"Courts have concluded the validity of the underlying civil penalty is one element of an action to reduce a penalty to judgment." *United States v. Pomerantz*, No. C16-0689JLR, 2017 WL 2483213, at *4 (W.D. Wash. June 8, 2017). Thus, in its current motion for partial summary judgment, Plaintiff asks the Court to affirm the IRS's determination that Quiel willfully failed to report the UBS #-1090, UBS #-2363, UBS #-9732, and Pictet #-2625 accounts on his 2007 and 2008 FBARs, and, therefore, is liable for civil penalties.

### A. Procedural Standard

A court must grant summary judgment if "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). On a motion for summary judgment, the movant bears the burden of establishing the absence of genuine issues of material fact. *Celotex,* 477 U.S. at 323; *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (en banc). In its analysis, the Court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B. Willful Failure to File FBARs

U.S. citizens (like Quiel) must report their financial interests in foreign bank accounts "for each year in which such relationship exists" and must "provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314." *United States v. Boyd*, 991 F.3d 1077, 1082 (9th Cir. 2021) (quoting 31 C.F.R. § 1010.350(a)) (cleaned up). The proper form for filing this report is the FBAR. *Id.* (quoting 31 C.F.R. § 1010.350(a)). An FBAR must "be filed . . . on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." *Id.* (quoting 31 C.F.R § 1010.306(c)). To prove liability for the FBAR assessments against Quiel, Plaintiff must prove, by a preponderance of the evidence, that (1) Quiel was a U.S. citizen; (2) with a financial interest

---

of Justice for litigation, which is what happened in this case.

in (or authority over) each of the foreign financial accounts; (3) that contained an aggregate balance exceeding $10,000 at some point during 2007 and 2008; and (4) that he willfully failed to disclose these accounts on an FBAR form. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350.

Quiel does not dispute that he is a U.S. citizen or that the accounts had an aggregate balance exceeding $10,000 in 2007 and 2008. Instead, he claims he did not have a financial interest in the accounts, and even if he did, his omission of these accounts on his 2007 and 2008 FBARs was not willful. For the reasons below, Plaintiff has not established Quiel's financial interest in the accounts, and its partial motion for summary judgment is denied on that basis.

### 1. Controlling Definition: Financial Interest

As an initial matter, the parties disagree about what source provides the operative definition of "financial interest." Under the current FBAR regulations, a U.S. citizen has a "financial interest" in a foreign account if a person who holds legal title to an account is "acting as an agent, nominee, attorney or in some other capacity on behalf of the United States person with respect to the account." 31 C.F.R. § 1010.350(e)(2)(i). Quiel notes, and Plaintiff agrees, that this regulation was not issued until 2011, i.e., three years after Quiel failed to report the accounts on his 2007 and 2008 FBARs. According to Quiel, the controlling definition of "financial interest" is listed on the 2007 and 2008 versions of the FBAR form. In relevant part, those forms state that a U.S. citizen has a "financial interest" in "each bank, securities, or other financial account in a foreign country" where "the owner of record or holder of legal title is . . . a person acting as an agent, nominee, attorney, or in some other capacity on behalf of the U.S. person." (Doc. 47-8 at 6 (2007 FBAR)); (Doc. 47-9 at 6 (2008 FBAR)); *see also Landa v. United States*, 153 Fed. Cl. 585, 593, 595 (2021) (applying the definition of "financial interest" listed on the 2009 FBAR).[2]

---

[2] At oral argument, Quiel asserted that Plaintiff's motion should fail because Legacy and Swiss International are corporations, and Plaintiff did not apply the FBAR's definition of "financial interest" that concerns corporations. (Doc. 47-9 at 6 (noting a U.S. citizen has a financial interest in an account that is owned by "a corporation in which the United States

The current regulatory definition of "financial interest" and the relevant FBAR definitions are the same in all material respects. Indeed, Quiel does not advance any substantive distinctions between them. Instead, he suggests that Plaintiff's motion must fail because it cited the wrong source in its initial filing, and the Court need not consider arguments raised for the first time in a reply. The Court's authority to disregard such arguments, however, is discretionary, and it will apply the FBARs' definition to Plaintiff's motion even though it did not cite the FBARs in its initial motion. *United States v. Roy*, No. CR10-606-PHX-GMS, 2010 WL 3327746, at *1 (D. Ariz. Aug. 24, 2010). Nevertheless, the United States has not established that Quiel had a financial interest in the accounts as a matter of law.

### 2. Collateral Estoppel

Plaintiff claims that under the doctrine of collateral estoppel, "Quiel's prior conviction for willfully filing false tax returns establishes, in this action, that he . . . had a financial interest in those accounts." (Doc. 39 at 5.) Collateral estoppel, also known as "issue preclusion," prevents parties from re-litigating issues that were necessarily decided in a prior action. *See U.S. v. Real Prop. Located at Sect. 18*, 976 F.2d 515, 518 (9th Cir. 1992) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5 (1979)). In the context of a prior criminal conviction, issue preclusion applies if: (1) the prior conviction was for a serious offense; (2) there was a full and fair trial; (3) the issue on which the prior conviction is offered was necessarily decided in the criminal trial; and (4) the party against whom the collateral estoppel is asserted was a party (or in privity with a party) to the prior

---

person owns directly or indirectly more than 50 percent of the total value of shares of stock or more than 50 percent of the voting power for all share of stock . . . .") However, the relevant FBARs point taxpayers to "31 C.F.R. 103.11(z) for a complete definition of 'person.'" (*Id*.) That definition includes "[a]n individual, a corporation, a partnership, a trust or estate, a joint stock company, an association, a syndicate, joint venture, or other unincorporated organization or group . . . and all entities cognizable as legal personalities." *See Am. Vantage Companies, Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1100 (9th Cir. 2002), *as amended on denial of reh'g* (July 29, 2002). That is, Quiel's cited definition captures corporations like Legacy and Swiss International.

trial. *Id.* (quoting *Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir. 1990)).

Here, the parties dispute whether the issue of Quiel's financial interest in the accounts was "necessarily decided" in his criminal trial. (*See* Doc. 39 at 5.) When a criminal conviction was based on a jury verdict, "issues which were essential to the verdict must be regarded as having been determined by the judgment." *Neman Fin., L.P. v. Citigroup Glob. Markets, Inc.*, No. CV1402499BROPLAX, 2015 WL 12765636, at *5 (C.D. Cal. Feb. 12, 2015) (quoting *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951)); *see also Bobby v. Bies*, 556 U.S. 825, 834 (2009). That is, "[a] determination ranks as necessary or essential only when the final outcome hinges on it." *Id.* at 835. To assess whether the jury's final outcome hinged on a particular determination, the Court must examine "the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts." *United States v. Kerr*, No. 19-cv-05432-PHX-DJH, 2021 WL 778607, at *2 (D. Ariz. Mar. 1, 2021) (quoting *Emich*, 340 at 569); *see also United States v. Weems*, 49 F.3d 528, 532 (9th Cir. 1995). Here, Plaintiff points to allegations in the initial indictment, trial evidence concerning Quiel's interest in the accounts, and the jury's instructions on the tax offense to show that Quiel's financial interest was necessarily decided in his criminal trial. (Doc. 39 at 5–8.) However, without more, these are not enough to show that Quiel's financial interest in any particular account was actually litigated, and the United States has assessed civil penalties against all four accounts

*Indictment.* The indictment charged Quiel with three offenses—willfully filing false tax returns, willful failure to file FBARs, and conspiracy. Among other things, the indictment alleged that Legacy and Swiss International were nominee entities created for Queil's benefit and described various facts to support this point, such as Rusch opening the "Swiss accounts in the names of these nominees: UBS accounts with numbers ending in 1090 and 2363 and a Pictet & Cie account with number ending in 2625." (Doc. 39 at 6 (citing Indictment, *United States v. Kerr et al*, No. 11-cr-02385-PHX-JAT, (D. Ariz. Mar. 1, 2021), ECF No. 3).) The indictment also described the accounts' balances and included

- 8 -

allegations that "Quiel . . . filed federal tax returns for 2007 and 2008 that he knew were inaccurate in two material ways: (1) the returns did not report his income from these Swiss accounts, and (2) the returns did not report that Quiel held a financial interest in the Swiss accounts." (*Id.* at 6–7.)  Plaintiff admits the indictment did not mention UBS #-9732 account.  (Doc. 39 at 6 n. 3.)

*Trial Evidence.*  At trial, however, the Government introduced the testimony of Representatives from UBS and Pictet who "authenticated bank statements for the UBS 1090, UBS 9732, UBS 2363, and Pictet 2625 accounts." (*Id*. (emphasis added).)   The UBS representative explained that the UBS #-9732 account functioned as a placeholder. The Government also introduced account statements for UBS #-1090, UBS #-2363, and Pictet #-2625 that listed Quiel as the accounts' "beneficial owner."  (*Id*.)  Finally, the Government provided Rusch's testimony that Quiel provided stock for the Swiss bank accounts and instructed Rusch on how to manage funds in the accounts.  (Doc. 39 at 7.)

*Jury Instructions.*  The jury instructions expressly incorporated the indictment. However, the jury did not find Quiel guilty of all of the charges.  As mentioned above, it convicted Quiel of willfully filing false tax returns but acquitted him of conspiracy and returned no verdict on the willful failure to file FBARs charge.  Thus, the tax conviction is the only conviction that is relevant to Plaintiff's collateral estoppel arguments.

The jury instructions on that charge contained three elements to be proved beyond a reasonable doubt: "First, the defendant made and signed a tax return for the respective years that he knew contained false information as to a material matter; Second, the returns contained a written declaration that they were being signed subject to the penalties of perjury; and Third, in filing the false tax returns, the defendant acted willfully."  Jury Instructions, *United States v. Kerr et al*, No. 11-cr-02385-PHX-JAT, (D. Ariz. Mar. 1, 2021), ECF No. 287 at 25).  The instructions then noted two instances that could constitute "false information as to a material matter."  (*Id*.)  Specifically, the first element could be met if the jury found that Quiel (1) "failed, on line 22 of the Form 1040, to report income received by him" or (2) "on Schedule B, line 7b of the form 1040[,] failed to report that he

had an interest in . . . bank, securities, or other financial accounts located in Switzerland." (*Id.* at 26.) Either finding was independently sufficient to support the first element of the offense. On its verdict form, however, the jury did not specify which of these findings it relied upon.

Nevertheless, Plaintiff claims that "[i]n finding Quiel guilty based on either of the misrepresentations, the jury necessarily had to determine, either expressly or because he had earned income from the accounts, that he had a financial interest in the Swiss accounts in the nominees' names." (Doc. 39 at 8.) This point is unpersuasive, however, because the jury instructions do not delineate between the Swiss accounts. As written, the instructions suggest that the jury could have reached its conviction by finding that Quiel received income from, or had an interest in, any one of the Swiss accounts at issue in this case, not each of them.

Still, Plaintiff argues that "the jury instructions thus required the jury to decide that Quiel had a financial interest in the relevant Swiss accounts" because they incorporate Counts 4 and 5 of the indictment, which "allege that 'on Line 22 (total income) of the Forms 1040, [Quiel] failed to report income earned from one or more bank, securities, and other financial accounts *in Switzerland*.'" (Doc. 51 at 3 (emphasis in the original).) But this statement suffers from the same defect as the jury instructions themselves: it enabled the jury to return a guilty verdict if it found that Quiel failed to report income earned from "one or more" accounts. The language in the indictment does not suggest the jury necessarily decided Quiel's financial interest in any particular account.

The government here assesses penalties on four separate accounts. To succeed on its motion, Plaintiff needed to show that Quiel's financial interest in each of the accounts (UBS #-1090, UBS #-9732, UBS #-2363, and Pictet #-2625) was necessarily decided. It has not done so. Accordingly, summary judgment is not properly granted on the basis of collateral estoppel.

### 3. Evidentiary Proof of Financial Interest

Plaintiff also argues that "[r]egardless of the preclusive effect of the prior

conviction, the evidence admitted at the criminal trial and produced in this action makes clear that Quiel controlled the Swiss accounts through nominee entities." (Doc. 39 at 9.) As mentioned above, according to the relevant FBARs, a U.S. citizen has a "financial interest" in "each bank, securities, or other financial account in a foreign country" account where "the owner of record or holder of legal title is . . . a person acting as an agent, nominee, attorney, or in some other capacity on behalf of the U.S. person." (Doc. 47-8 at 6 (2007 FBAR), Doc. 47-9 at 6 (2008 FBAR).) It is undisputed that Legacy and Swiss International were created on Quiel's behalf.[3] (Doc. 47 at 10 (noting that Quiel does not dispute Plaintiff's representation that "[a]t Rusch's direction, Arndt created Swiss corporations on behalf of Kerr and Quiel.").) It is also undisputed that Legacy served as the owner of record for the UBS #-1090, UBS #-9732, and Pictet #-2625 accounts and that Swiss International served as the owner of the record for the UBS #-2363 account. (Doc. 47 at 12.) However, there are apparent disputes as to (a) whether Legacy and Swiss International were Quiel's nominees and (b) whether and how the corporations acted on his behalf.

Although a "financial interest" can be established if an entity acts "an agent, nominee, attorney, or in some other capacity" on a U.S. person's behalf, in its original motion, Plaintiff only argues that "Legacy and Swiss International – served as Quiel's nominees." (Doc. 39 at 10 (emphasis added).) Plaintiff attempts to establish this relationship by invoking Rusch's testimony from the criminal trial that "the Swiss entities were incorporated using nominee directors Rusch could control," never became active businesses, and were a "façade that used nominee directors for Quiel's benefit." (*See* Doc. 47 at 11, Doc. 39 at 9.) In its Reply, Plaintiff makes a broader argument that Legacy and Swiss International acted either as nominees "or in some other capacity on behalf of Quiel." (Doc. 51 at 4 (internal punctuation omitted).)

These arguments fail for three reasons. First, Plaintiff has not offered a legal

---

[3] For the reasons described in footnote 2, Legacy and Swiss International were qualifying "persons" under relevant regulations.

- 11 -

definition of "nominee."  <u>Second</u>, whatever legal definition of "nominee" applies, Quiel disputes Rusch's testimony that the corporations used "nominee directors" by pointing to other portions of his testimony where he claims to have advised Quiel about structuring offshore corporations in a tax compliant way.[4]  (Doc. 47-5 at 1, 3–4.)  A reasonable jury could consider Rusch's conflicting testimony and find the corporations were not a "façade."[5]  <u>Third</u>, the Court will not consider the theories Plaintiff raises for the first time in Reply.  The only relevant question appropriately presented here is whether Legacy and Swiss International were Quiel's nominees, and, for the reasons mentioned above, Plaintiff has not established this point as a matter of law or fact.

## CONCLUSION

Accordingly, Plaintiff's motion for summary judgment is denied, and the Court will reserve the remainder of the issues for trial, including whether Legacy and Swiss International acted on Quiel's behalf, and whether Quiel's failure to list the Swiss accounts on his FBARs for the years in question was "willful."  The Court will also reserve judgment on the substance of Quiel's pending motion for summary judgment (Doc. 37) because it must determine his liability before deciding whether the IRS's fee assessment was properly

---

[4] To the extent that Quiel disputes these representations on the basis of Exhibit C, his disputes present no issues of fact.  Exhibit C is an out-of-court audio recording that appears to capture a conversation between Quiel, Rusch, and a third attorney working on Quiel's behalf.  Quiel attempts to dispute Plaintiff's claims with a portion of the recorded conversation where Rusch states that "Quiel never intended to set up shell corporations to evade taxes . . . Quiel, Kerr and Rusch legitimately tried to find investors and raise money for their investment business but unfortunately failed." (*Id*.)  Quiel also points to another part of the conversation where Rusch says that Quiel retained him because of a desire to comply with U.S. tax laws after the IRS audited him upon discovering a Bahamian bank account linked to the Visa card in Quiel's name.  (*Id*.)  All of these statements are inadmissible hearsay because they are offered for the truth of the matters asserted.

[5] Although Plaintiff claims that Quiel relies on inadmissible hearsay in his Response, Rusch's testimony is admissible.  Plaintiff acknowledges that it "was unable to depose Rusch in this action because it could not locate him.  Upon information and belief, Rusch resides out of the country under a pseudonym." (Doc. 39 at 9.)  Thus, under Federal Rule of Evidence 804(a)(5), Rusch is unavailable, and, under Rule 804(b)(1), his former testimony is not excluded by the rule against hearsay.

calculated under the relevant statutory authority.

**IT IS THEREFORE ORDERED** that Plaintiff's Partial Motion for Summary Judgment (Doc. 39) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Partial Motion for Summary Judgment (Doc. 37) is also **DENIED.**

Dated this 5th day of July, 2023.

_G. Murray Snow_
G. Murray Snow
Chief United States District Judge